UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

Rosco, Inc.,

                    Plaintiff,                    CV-96-5658 (CPS)

     - against -                                  MEMORANDUM OPINION
                                                  AND ORDER
Mirror Lite Company,

                    Defendant.

----------------------------------------X

SIFTON, Senior Judge.


     In 1996, plaintiff, Rosco, Inc., commenced this action

against defendant, Mirror Lite Company, asserting claims of

design patent infringement, trade dress infringement, false

designation of origin, tortious interference with business

relationships, misrepresentation in violation of 15 U.S.C. §

1125(a), and common law trademark infringement.  In addition to

damages, the complaint sought declaratory and injunctive relief

pursuant to 29 U.S.C. §§ 2201 and 2202.  Mirror Lite asserted a

counterclaim of patent infringement in violation of 15 U.S.C. §

1125(a).

     The matter was tried before the undersigned sitting without

a jury between March 6 and March 10, 2000.  After appeal to the

Federal Circuit and remand for determination of infringement, I

found that Rosco had infringed Mirror Lite's '984 patent. Now

before this Court is (1) Rosco's Motion for "Summary Judgment of No Patent Infringement Relative to Oval Mirrors Sold Post-Trial"; and (2) Mirror Lite's Motion for Summary Judgment of Infringement as to all post-trial Hawk Eye and Mini Hawk Eye mirrors sold by Rosco[1]. In addition to the summary judgment motions, a forage of related motions have been filed and responded to, namely (3) Mirror Lite's Motion to Strike Rosco's Memorandum on Claim Construction Concerning Varying Radius of Curvature; (4) Mirror Lite's Motion to Strike the Declaration of Peter Sinclair Submitted by Rosco in Support of its Opposition to Mirror Lite's Motion for Summary Judgment; (5) Mirror Lite's Motion to Strike Rosco's New Evidence and Reliance on a Lomar Mirror; (6) Mirror Lite's Motion to Strike Rosco's Newly Offered CMM Tests and Accompanying Supporting Declaration of Professor Folan; and (7) Rosco's Motion to Strike the Declaration of Dr. Howell[2].

For the reasons set forth below, Rosco's Motion for Summary Judgment is denied, Mirror Lite's Motion for Summary Judgment is granted in part and denied in part. Mirror Lite's Motions to

---

[1] Both summary judgment motions concern claim 1 of the '984 patent. Specifically, whether the Hawk Eye and Mini Hawk Eye mirrors sold by Rosco post-trial exhibit "varying radii [radius] of curvature that decrease[s] from the intersection with the minor axis to the perimetral edge." As noted previously in this litigation, a radius of curvature is a measurement of distance along a body's surface from its center to its edge.

[2] Along with this motion, Rosco made a request to sanction Mirror Lite for abuse of the legal process. The request is frivolous and I deny it. If anyone is delaying the resolution of this lawsuit (and has a motivation to do so) it is Rosco.

Strike Rosco's Memorandum on Claim Construction and Rosco's New Evidence and Reliance on a Lomar Mirror are denied as moot. Mirror Lite's Motion to Strike the Declaration of Peter Sinclair is denied. Mirror Lite's Motion to Strike Rosco's Newly Offered CMM Tests and Accompanying Supporting Declaration of Professor Folan is denied in part and granted in part. Rosco's Motion to Strike the Declaration of Dr. Howell is granted only with respect to paragraph 10.

## BACKGROUND

Procedural History

The facts of this case have already been stated several times in the prior opinions in this case. *Rosco v. Mirror Lite*, 139 F.Supp.2d 287 (E.D.N.Y 2001); *Rosco v. Mirror Lite*, 304 F.3d 1373 (Fed. Cir. 2002). It is unnecessary to repeat them fully again here. A procedural history is offered below.

Rosco's '357 design patent relates to an oval, highly convex cross-view mirror with a black, flat metal backing. Rosco applied for this patent in April of 1992, and the patent issued in April of 1994. Mirror Lite's '984 utility patent relates to an oval cross-view mirror with a varying radius of curvature along the major axis of the convex ellipsoid mirror lens. Mirror Lite applied for this patent in September of 1992, and the patent issued in December of 1996.

In its complaint, Rosco sought a declaratory judgment that all claims of Mirror Lite's '984 patent were invalid and unenforceable due to Mirror Lite's inequitable conduct in procuring the patent and a finding that Mirror Lite infringed its '357 patent. Mirror Lite filed a counterclaim alleging that Rosco infringed the '984 patent. At trial, Mirror Lite contended that Rosco's patent was invalid as functional and therefore not infringed.

After a bench trial, I held in relevant part that Rosco's '357 patent was invalid as functional and obvious pursuant to 35 U.S.C. § 103.[3] I also found Mirror Lite's patent invalid under 35 U.S.C. § 102 (e)[4] and (g)[5]. Accordingly, I did not reach the merits of Mirror Lite's patent infringement claim.

The Federal Circuit reversed my conclusions that both Rosco and Mirror Lite's patents were invalid. The Court remanded in relevant part for consideration of: 1) whether Mirror Lite had proven by clear and convincing evidence that Rosco's patent was invalid under 35 U.S.C. § 103; 2) whether Mirror Lite had

---

[3] 35 U.S.C. § 103 limits patentability if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

[4] 35 U.S.C. § 102(e) provides that person is entitled to a patent unless the invention was the subject of a previously issued patent.

[5] 35 U.S.C. § 102(g) provides that person is entitled to a patent unless "before such person's invention thereof, the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it."

infringed Rosco's patent; 3) whether Mirror Lite's patent was invalid under 35 U.S.C. §§ 102(a),[6] (f), and 103; 4) whether Mirror Lite's patent was unenforceable due to inequitable conduct; and 5) whether Rosco had infringed on Mirror Lite's patent.

On remand, Mirror Lite conceded that Rosco's patent was valid, while Rosco argued that Mirror Lite's '984 patent was invalid.  Rosco contended that prior to the date of Mirror Lite's invention, Rosco had conceived, reduced to practice, and sold mirrors containing all the elements of claims 1, 2, 3, 6, 7, and 8 of the '984 patent, thus rendering it invalid under 35 U.S.C. § 102(a).  Benjamin Englander, one of Rosco's owners, testified to that effect.  Rosco introduced this mirror as Exhibit 110, called a "Hawk Eye Mirror" based on the '357 patent.  Mirror Lite responded that: 1) Rosco failed to show that its previous mirror had decreasing radii of curvature along its major and minor axes and did not contain a reflective outer surface and a non-reflective inner surface; or in the alternative, 2) that Rosco could not show that it appreciated these aspects of its mirror; and 3) that Rosco could not prove that it had used this mirror publicly before the priority date of the '984 patent.

I found that Exhibit 110 did have these qualities, that

---

[6] 35 U.S.C. § 102(a) provides in part that a person is not entitled to a patent unless "the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent."

Rosco had used the mirror publicly, and that Rosco had anticipated Mirror Lite's patent under 35 U.S.C. § 102. I also held that Mirror Lite's '984 patent was unenforceable due to Mirror Lite's inequitable conduct in procuring the patent. Specifically, I held that Mirror Lite had intended to mislead the examiner by failing to disclose prior art.

I also held that Rosco failed to prove its claim of infringement. In particular, Rosco sought to prove that four of Mirror Lite's mirrors infringed on Rosco's '357 patent, but Rosco had not proven that the four allegedly infringing mirrors appropriated the novelties that distinguished Rosco's '357 patent from prior art.

On appeal for the second time, the Federal Circuit again reversed this Court's conclusion that Exhibit 110 anticipated Mirror Lite's '984 patent. Specifically, the Federal Circuit held that Rosco failed to prove by clear and convincing evidence that Exhibit 110 disclosed every claim limitation of the '984 patent because "[t]estimonial evidence of invalidity must be corroborated." *Rosco, Inc. v. Mirror Lite, Co.*, 03-1562, 120 Fed.Appx. 832 (Fed. Cir. Jan. 19, 2005) (unpublished). Rosco presented the testimonial evidence of Benjamin Englander to the effect that he had designed Exhibit 110 and that it contained every element of claims 1, 2, 3, 6, 7, and 8 of Mirror Lite's '984 patent. Exhibit 110 itself, the Federal Circuit held, was

insufficient to corroborate this testimony.  Nor did the

testimony of Rosco's expert witness, Harvey Manbeck, suffice

because he based his testimony on Benjamin Englander's

representations.  With regard to my finding of inequitable

conduct by Mirror Lite for failing to disclose prior art, the

Federal Circuit held that there was insufficient evidence of

Mirror Lite's intent to deceive.  The Federal Circuit remanded

"for further proceedings solely on the issue of infringement, the

determination of which should be made on the existing trial

record."

I thereafter determined that Mirror Lite had proven that

Rosco infringed Mirror Lite's '984 patent. I also ordered limited

additional discovery on two issues: (1) whether and to what

extent Rosco continued to sell Hawk Eye and Mini Hawk Eye mirrors

post-trial; and (2) post-trial revenue, costs, and profits Rosco

has earned or incurred through sale or manufacture of Hawk Eye

and Mini Hawk Eye mirrors.

## Recent Factual History

Mirror Lite then made a motion for a permanent injunction

pursuant to 35 U.S.C. §283 which I granted with the exception of

¶2(b).  The injunction will be entered upon resolution of the

remaining damages issues.  Rosco then requested limitations on

the scope of post-trial damages discovery and correction of

factual finding #16 of my August 26, 2005 opinion, that Rosco

sold "in excess of 150,000 Hawk Eye mirrors." I precluded discovery as to inquiries concerning the period from December 31, 1996 to March 6, 2000 and to the extent it requests information on "all mirrors" or on "mirrors" generally. I also corrected factual finding #16 of my August 26, 2005 opinion, and adopted the pre-trial sale figure of 90,000 infringing mirrors. In addition, Rosco raised the new argument that some of its post-trial Hawk Eye and Mini Hawk Eye mirrors did not infringe because they have a constant radius of curvature, and thus that Mirror Lite should not be allowed discovery as to these non-infringing mirrors. I stated in the decision that Mirror Lite is entitled to determine for itself whether some Hawk Eye and Mini Hawk Eye mirrors have a constant radius of curvature but that Mirror Lite was only permitted to take discovery of revenues and costs on mirrors that are *prima facie* infringing.

Rosco and Mirror Lite then filed cross motions for summary judgment relating to the Hawk Eye and Mini Hawk Eye mirrors sold by Rosco post-trial. Rosco asserts that its post-trial Hawk Eye and Mini Hawk Eye mirrors have constant radii of curvature or substantially constant radii of curvature and therefore do not infringe Mirror Lite's '984 patent. Rosco submits numerous tests and expert declarations about the contested mirrors to show that the mirrors do not infringe. Mirror Lite argues that all of the post-trial Hawk Eye and Mini Hawk Eye mirrors have varying radii

of curvature and all infringe. Mirror Lite submits its own tests
and expert declarations as evidence in support of its position.
In addition, as noted above, both sides have filed various
evidentiary motions relating to Rosco's summary judgment
submissions.

## Discussion

Order in which to Address the Motions

Both Rosco and Mirror Lite have filed motions for summary
judgment and numerous motions to exclude evidence. Because a
court may consider only admissible evidence when ruling on a
motion for summary judgment, I first determine whether the
testimony of the expert witnesses and their accompanying exhibits
and tests are admissible. *See Nora Beverages, Inc. v. Perrier
Group of Am.,* 164 F.3d 736, 746 (2d Cir. 1998); *Cacciola v. Selco
Balers, Inc.,* 127 F. Supp. 2d 175, 179-80 (E.D.N.Y. 2001).

Declaration of Peter Sinclair and the Mirror Bisecting Test

Mirror Lite moves to strike Mr. Sinclair's declaration on
three grounds: (1) that he is not a qualified expert in the field
of mirror design and manufacture; (2) that the mirror bisecting
test[7] is unreliable; and (3) that his definition of a "varying

---

[7] This test was devised by Rosco's Benjamin Englander to ascertain
whether a mirror lens has a constant radius of curvature. A mirror's lens is
glued to an aluminum base and cut along the major axis. The major and minor

radius of curvature" is not based on a reliable scientific source. I reject each of Mirror Lite's contentions, and will consider Mr. Sinclair's declaration in determining the motion for summary judgment. Paragraphs 1-3 of Sinclair's declaration relate to his retention by Rosco as an expert. Paragraphs 4-12 of Sinclair's declaration consist of his conclusion that the mirrors had a constant radius of curvature based the mirror bisecting tests and the reasons for that conclusion. Paragraphs 13 and 14 consist of Sinclair's definition of "varying radius of curvature."

Federal Rule of Evidence 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods

---

axes were found by determining the two points furthest apart on the oval. A compass, anchored on the four distal peripheral points of the axes, is used to mark the center of the mirror. Then, lines are drawn from the center of the mirror along the major axis to the perimetral edge. Then, the mirror is cut along the major axis. The cut mirror half was then placed on paper and traced to determine the surface curvature. Finally, a constant radius of curvature was obtained from a CAD (computer aided design) machine and is superimposed over the mirror's tracing.

reliably to the facts of the case.

The Rules of Evidence assign to the trial judge the task of ensuring that expert testimony is reliable and relevant. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597, 113 S.Ct. 2789, 125 L.Ed.2d 469 (1993). The burden is on the party proffering the expert testimony to lay a foundation for its admissibility. *Plourde v. Gladstone*, 190 F. Supp. 2d 708, 718 (D.Vt. 2002). A first step in determining the admissibility of expert testimony is to determine whether the witness has the requisite qualifications. *See Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 360 (2d Cir. 2004) (describing an analysis of the reliability of the witness's methods as "superfluous" where the witness lacked qualifications). Second, the Court must determine if the expert's methodology is sufficiently reliable. *See id.*

A court must consider the "totality of a witness's background when evaluating the witness's qualifications to testify as an expert." 29 WRIGHT & GOLD, FEDERAL PRACTICE AND PROCEDURE § 6265, at 246 (1997). An expert must be limited to opinion testimony in the area of expertise in which the proffering party can qualify the expert. *Goodwin v. MTD Prods., Inc.*, 232 F.3d 600 (7th Cir. 2000).

Mr. Sinclair is a high school mathematics teacher. He graduated with a Bachelor of Science degree in general mathematics from St. John's University in 1993 and a Masters

Degree in mathematics also from St. John's University in 1995. Since graduation, he has worked in a variety of mathematics teaching positions including as a preparatory course instructor for The Princeton Review, an adjunct mathematics professor at St. John's University and, most recently, as a high school mathematics teacher.

As Mirror Lite notes, there is no evidence that Sinclair has ever constructed or tested mirrors, published papers or lectured on the subject, or worked for a company that designed or manufactured mirrors. He does, however, have a general knowledge of mathematics, and it is in this general mathematical knowledge that Rosco seeks to rely on Sinclair as an expert. Mr. Sinclair's declaration concerns a method of measuring the radius of curvature of a multi-dimensional object and the definition of a mathematical term, and I find these are topics for which Mr. Sinclair's credentials qualify him as an expert.

The second step in evaluating the admissibility of expert testimony is determining whether it rests on a reliable foundation. *Daubert*, 509 U.S. at 597. In performing this inquiry, a court is to consider whether the testimony is grounded in facts or data and reliable methods or principles, and whether the witness has applied the principles and methods to the facts of the case. FED. R. EVID. 702. The Supreme Court has identified a number of factors that may be relevant to the reliability of

the testimony, including: (1) whether the theory or technique has been or will be tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the technique or theory has gained general acceptance in the relevant expert community. *Daubert*, 509 U.S. at 593-94. In addition, a proponent of expert testimony bears the burden of showing "a grounding in the methods and procedures of science which must be based on actual knowledge and not subjective belief or unaccepted speculation." *Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 780 (10th Cir. 1999).

The mirror bisecting test was devised in anticipation of the instant summary judgment motions by Benjamin Englander, one of Rosco's owners. (Englander Decl. ¶ 22, Feb. 14, 2007.) Rosco has not shown that the bisecting test has been published for review by peers, nor has Rosco discussed the known or potential rates of error. Nor is the mirror bisecting test the standard set out by the Federal Motor Vehicle Safety Standards ("FMVSS") § 111[8] for testing bus mirrors which uses a spherometer[9].

Yet, Mr. Sinclair's methodology in carrying out the mirror bisecting test is sound. His evaluation of the data derived from

---

[8] FMVSS § 111 sets forth the specifications pertaining to the rear vision parts of a vehicle.

[9] A spherometer is an instrument used to measure the radius of curvature of a sphere by taking measurements at different points on the surface of the sphere.

the mirror bisecting test and his explanation of how the test was conducted is grounded in his knowledge of general mathematics. Mr. Sinclair's general knowledge and experience is also a sufficient basis for his definition of the term "varying radius of curvature," and I will consider his definition as well in deciding the motion for summary judgment. Mirror Lite has shown no reason why its expert(s) cannot replicate the mirror bisecting test and evaluate the test's technique, theory and potential for error or offer a definition for the term "varying radius of curvature" themselves.

So, I see no reason why Mr. Sinclair's declaration should not be found sufficiently reliable to warrant admission into evidence.

Rosco's CMM Tests[10] and Declaration of Professor Folan[11]

---

[10] A Coordinate Measuring Machine, or CMM, is a device for measuring the dimension of an object to a fine precision. In a typical CMM, a probe containing a stylus is mounted to a movable arm above a table which supports an object to be measured. A control means in the CMM continuously monitors movement of the probe in the three coordinate directions, so that the precise location in space of the stylus tip is at all times determined to great accuracy. To make a measurement, an object is mounted on the CMM table, and the probe is moved towards the object until the stylus attached to the probe makes contact with the object. The coordinates of the stylus tip at the point of contact are recorded, thus giving a measurement of the position of one point on the surface of the object. The probe is then repositioned and moved towards another point on the object, this procedure being repeated a number of times until all such measurements as are necessary have been made. From the coordinates of the various points at which the stylus tip contacted different surfaces of the object, the dimensions of the object can be calculated by a computer.

[11] Professor Lorcan M. Folan submitted two declarations, one dated November 20, 2006 and a supplemental declaration dated February 14, 2007. Mirror Lite is moving to strike Professor Folan's supplemental declaration.

Mirror Lite argues that Rosco's CMM tests should be stricken for three reasons: (1) the CMM tests were improperly substantiated by Rosco's expert; (2) the only method on the record in this case for determining a radius of curvature is by use of a spherometer; and (3) Rosco failed to respond in a timely fashion to discovery requests for testing information. In addition, Mirror Lite wants Professor Lorcan M. Folan's supplemental declaration of February 14, 2007, stricken.

Paragraphs 1-6 of the Supplemental Declaration are an introduction to the declaration including a background of the five mirrors in contention and a statement by Prof. Folan that he participated in the testing of three of the mirrors. Paragraphs 7-18 discuss the Template Tests[12], paragraphs 19-25 discuss the CMM tests[13], paragraphs 26-34 discuss the Mirror Bisecting Test,

---

[12] The Template Test was devised by Mirror Lite's Daniel Swain to ascertain whether a mirror lens has a constant radius of curvature. Radii of curvature templates are prepared by a Computer Numerical Control ("CNC") Machine, accurate to thousandths of an inch. The templates prepared by the CNC Machine have perfect radii of curvature. The templates are then placed along the major axis of the mirror lens. The templates fit properly when the entire template sits directly on the lens and there is no space between the template and the mirror lens. For his template test, Daniel Swain first made templates of constant radius and then placed the templates on the mirror. He did not ascertain the actual radius of curvature of the mirror he used before the templates were made by the CNC machine. (Swain Decl. ¶¶ 13-14, Nov. 10, 2006.)

When Prof. Folan carried out the Template Test, he determined the radius of curvature of each mirror prior to having the template of constant radius of curvature made by the CNC machine. Then, he fitted the template, made with the predetermined radius of curvature measurement, to the mirror. And finally, to confirm that the template was accurate, he placed the template along a circular disc with a constant radius of curvature. (Supplemental Folan Decl. ¶¶7-18.)

[13] A co-ordinate mapping machine ("CMM") maps three-dimensional objects to a high degree of accuracy. The machine moves a measuring probe along the surface of an object and takes measurements at certain points along the

and paragraphs 35-41 discuss spherometer tests.  In addition,
Prof. Folan's supplemental declaration discusses manufacturing
tolerances in paragraphs 42-54 and comments on the disclosure of
the '984 patent in paragraphs 55-60.  In paragraphs 61-66, Prof.
Folan summarizes his findings.

In its motion, Mirror Lite argues that the CMM tests were
improperly substantiated because Professor Folan did not conduct
or supervise the tests, nor did he specify how the tests were to
be conducted and did not participate in the CMM testing in any
way.  (Mirror Lite's Mot. to Strike Rosco's Newly Offered CMM
Tests and Accompanying Supp. Decl. Of Prof. Folan.)  Prof. Folan
states that he reviewed the data from the test results and gave
his interpretation of those results.  (Supplemental Folan Decl.
¶20, Feb. 14, 2007.)  Prof. Folan has no experience in CMM
testing and interpretation.  He did not observe or participate in
the CMM testing of the mirrors, he never before interpreted CMM

surface of the object.
    Rosco commissioned tests from Nel Pretech Corporation, a testing
laboratory.  Nel Pretech tested three Lexalite Hawkeye mirrors, three Lexalite
Minihawkeye mirrors and three Replex Hawkeye mirrors.  Each mirror was leveled
on an average 12-point plane on top of a flange surface.  The axis rotation
and XY origin was set by using a best-fit alignment on a 168 and 164-point
ellipses taken at 0.125" from the top flange surface around the perimeter of
the mirror.  Nel Pretech attached each mirror to the flange using low
temperature glue.  The radii of the mirrors were measure along the major axis
of the mirror surface starting and ending at a plane 0.125" from the top of
the flange surface.  The CMM machine scanned points approximately every 1mm,
and recorded the measurement at each point.  Each measurement reflects the
radius of curvature at a particular scan point.  (Supplemental Folan Decl. Ex.
E, 1.)
    Nel Pretech then organized the measurement data into charts, one chart
for each type of mirror.  Prof. Folan's CMM conclusions were based on his
analysis of these charts.  (Supplemental Folan Decl. ¶20.)

test results nor had he ever commissioned or seen a CMM test performed. (Folan Dep. 29:4-19, 45:9-46:5.) Therefore, Prof. Folan does not have the knowledge, skill, experience, training or education necessary to interpret the CMM test results and his analysis is not the product of reliable principles as required by Rule 702 of the Federal Rules of Evidence, and hence the test data is unsubstantiated and without a reliable foundation. *Daubert*, 509 U.S. 579. The CMM tests are thus stricken from the record.

Because I am striking the CMM test data on the basis of an unreliable foundation, there is no reason to address Mirror Lite's other arguments as to why the CMM tests should be stricken from the record.

Mirror Lite also wants Prof. Folan's supplemental declaration stricken. In his supplemental declaration, Prof. Folan addresses the numerous tests used by Rosco and Mirror Lite to test the mirrors' radii of curvature. I stated above that Prof. Folan does not have the requisite basis for interpreting the CMM test results and as such paragraphs 19-25 and 63 of his supplemental declaration are stricken from the record as they specifically address the CMM tests. The Mirror Bisecting Test is a reliable test, as I stated above, and as such paragraphs 26-34 of Prof. Folan's supplemental declaration are allowed because they address this test. I also see no reason to strike the

remainder of Prof. Folan's supplemental declaration as it offers his expert opinion on two other tests for measuring a radius of curvature, namely the Template Test and the spherometer test, and other expert opinions which he is qualified to offer.

Declaration of Prof. Howell

Rosco argues that Prof. Howell's declaration should be stricken in its entirety because he has no knowledge of mirror design or manufacture, has never used and has no understanding of a spherometer, and used incorrectly sized templates for the template test[14]. In addition, Rosco argues that Prof. Howell's opinion and meaning of the scope of the patent claims should be stricken because in his deposition he contended that he isn't qualified to interpret the patent.

Dr. Howell has a Ph.D. in chemical engineering and a Master's degree in mechanical engineering. His Ph.D. course work included optics classes, and his thesis involved optics. He is chairman of the Department of Mechanical Engineering at Lawrence Technical University in Southfield, Michigan. He has taught many courses in engineering design and manufacturing, including a course entitled Instrumentation and Experimental Methods. As

---

[14] In the template test, a mirror's radius of curvature is measured and that measurement is used to create a template with a constant radius of curvature, the template is made by a computer numerically controlled machine. The template is then placed on the major axis of the mirror. If the template is a perfect fit, then, ostensibly, the mirror has a constant radius of curvature.

such, he has the "knowledge, skill, experience, training, or education" to offer his expertise on mechanical engineering, design, manufacturing and mechanical instrumentation and experimentation. *Goodwin*, 232 F.3d 600 (an expert's opinion is limited to the area of expertise in which he can qualify as an expert).

Dr. Howell offers his opinions on the basis of his "background and experience in the engineering field." (Howell Decl. ¶7, Jan. 12, 2007.) An opinion on this basis is well within his area of expertise. As a mechanical engineer, he is qualified to use a spherometer, a simple mechanical instrument. The argument that his lack of knowledge of manufacturing or design tolerances for mirrors disqualifies his opinion in this case is unpersuasive, because, as I already stated, Dr. Howell is offering his expertise in mechanical engineering, not in mirrors.

Rosco's also argues that Dr. Howell misapplied the template test by using wrongly sized templates. Rosco contends that based on Dr. Howell's declaration, the template test is not an accurate test of a constant radius of curvature unless the template's constant radius of curvature is exactly the same as the mirror's radius of curvature. Rosco essentially argues that Dr. Howell did not independently measure the radii of curvature of the mirrors he tested and therefore was unaware of the mirrors' actual radii of curvature. Since Rosco's argument is sound, Dr.

Howell would not be in a position to know whether the template had the correct constant radius when he placed the template on the mirror.  Hence, Dr. Howell's template test and analysis is unreliable and paragraph 10 of his declaration is stricken.

Rosco's final contention is that Dr. Howell's interpretation of the '984 patent should be stricken.  In his declaration, Dr. Howell states that he reviewed the patent for a teaching or suggestion as to the meaning of the claims.  He explained in his deposition that he limited his interpretation of the patent to the mirrors in question and would not respond to questions related to his "understanding of patents" because he is not a patent attorney, but an engineer.  (Howell Dep. 87:18-94-17, Feb. 7, 2007.)  Dr. Howell's opinions on the '984 patent were given in his capacity as an expert in mechanical engineering, and are therefore admissible.

<u>Damages</u>

Both Rosco's Motion for Summary Judgment and Mirror Lite's Cross Motion relate to damages.  Im my September 29, 2006 Memorandum Opinion and Order, I stated that Mirror Lite is entitled to discovery to determine whether or not some Hawk Eye and Mini Hawk Eye mirrors have a constant radius of curvature and thus do not infringe.  The real question before me is whether Rosco continues to sell the same product post-trial that was found to infringe at trial.  Rosco is still selling mirrors under

the names "Hawk Eye" and "Mini Hawk Eye," the same names it used
to sell the infringing mirrors.

In general, the purpose of a patentee's monetary award is to
adequately compensate the patentee for the infringement and to
restore the patentee to the position he would have occupied had
the wrong not been committed. *Albemarle Paper Co. v. Moody,* 422
U.S. 405, 418-19, 95 S. Ct. 2362, 45 L. Ed. 2d 280 (1975); *Armco
Inc. v. Republic Steel Corp.,* 707 F.2d 886, 891, 219 U.S.P.Q.
(BNA) 397, 402 (6th Cir. 1983). The measure of damages in an
infringement case is "the difference between [the patent owner's]
pecuniary condition after the infringement, and what his
condition would have been if the infringement had not occurred."
*Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476,
507 (1964). There must be adequate evidence in the record to
recover lost profits. This requires evidence of "a causal
relation between the infringement and its loss of profits." *BIC
Leisure Prods., Inc. v. Windsurfing Int'l, Inc.,* 1 F.3d 1214,
1218 (Fed. Cir. 2001). Where the evidence is inadequate to
establish lost profits, i.e. a patent owner cannot establish
causation for a segment of the infringer's sales, a Court must
determine a "reasonable royalty rate."[15]  35 U.S.C. § 284;

---

[15] In determining a reasonable royalty rate, the Court is to consider,
to the extent there is evidence on the record, the factors listed in *Pacific
Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).
*See Dow Chemical Co. v. Mee Indus., Inc.*, 341 F.3d 1370, 1381-82 (Fed. Cir.
2003); *Lindemann Mashinenfabrik GmbH v. American Hoist & Derrick Co.*, 895 F.2d

*Lindemann Mashinenfabrik GmbH v. American Hoist & Derrick Co.*,
895 F.2d 1403 (Fed. Cir. 1990).  Under either a lost profit or
reasonable royalty measure, the patent holder must "reconstruct
the market to project economic results" of what would have
occurred had the market developed absent the infringing product
or what agreement would have resulted had a hypothetical
negotiation over royalty rates occurred.  *Ericsson, Inc. v.
Harris Corp.*, 352 F.3d 1369, 1377 (Fed. Cir. 2003); *Riles v.
Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir.
2002).

     In order to show causation for damages to recover lost
profits, the patent owner must show that he would have made the
sales of the product *but for* the infringement.  *BIC Leisure
Prods., Inc.*, 1 F.3d 1214, 1218.  The element of causation has
been broken down into three components: (1) demand for the
patented product in the market; (2) the patent owner's ability to
meet the market demand; and (3) the absence of acceptable
substitutes.  *See, e.g., Ericsson Inc.*, 352 F.3d 1369; *Yarway
Corp. v. Eur-Control USA, Inc.*, 775 F.2d 268, 275-76, 227
U.S.P.Q. (BNA) 352, 356-57 (Fed. Cir. 1895); *Panduit*, 575 F.2d at
1156, 197 U.S.P.Q. (BNA) at 729-30.  Once a patentee shows
causation, the burden of going forward shifts to the infringer to

----

1403 (Fed. Cir. 1990); *Devex Corp. v. Gen. Motors Corp.*, 667 F.2d 341 (Fed.
Cir. 1981); *National Presto Indus. v. Black & Decker (U.S.), Inc.*, 760 F.
Supp. 699, 701 (N.D. Ill. 1991).

show that the patentee reasonably would not have made all or some of the diverted sales but for the infringement.

In addition, a patentee can recover future damages resulting from future lost sales. *Brooktree Corp. v. Advanced Micro Devices, Inc.,* 977 F.2d 1555, 1581 (Fed. Cir. 1992) ("projected future losses may be recovered when sufficiently supported"). Under this theory of damages, a patent owner contends that it will loose some amount of future sales as a result of past infringement. *See, e.g., Sun Prods. Group, Inc. v. B&E Sales Co.,* 700 F.Supp. 366, 385 (E.D. Mich. 1988). To prove such damages, the patent owner will look at past sales and sales diverted to the infringer during the period of infringement and project how many future sales it is likely to lose based on the infringer's past infringement. *See, e.g., Id.*

In *Sun Prod. Group, Inc.,* plaintiff held a patent and trademark on the "Headchair," a foldable head rest, and sold 200,000 units in the first year of production. *Id.* Defendant began marketing and selling the "Heads-Up" head rest during that same year. *Id.* at 372. Once Heads-Up was introduced to the market, sales of Headchair fell drastically. *Id.* at 378-81. Plaintiff brought a suit alleging patent and trademark infringement. Plaintiff sought lost profit damages. *Id.* at 378-82. Defendant opposed these damages on the basis the products were sold at very different prices to different retailers and

ultimately to different consumers, and therefore, sales of Heads-Up could not cause a loss of sales of Headchair. *Id.* at 382. Plaintiff brought in a marketing expert to project future sales of Headchair in a marketplace without Heads-Up. *Id.* The court accepted plaintiff's marketing expert's estimates of future sales and awarded plaintiff future lost profits due to lost sales for four years after the conclusion of the lawsuit because defendant's act permanently impaired future sales of Headchair and that the "sales momentum and business goodwill which flowed from [plaintiff's] successful first year has, to a great extent, been irreparably lost." *Id.* at 368-87.

The Federal Circuit similarly awarded damages for loss of future sales in a two-supplier market in *Lam, Inc. v. Johns-Manville Corp.* 718 F.2d 1056 (Fed. Cir. 1983). At trial, the plaintiff-patentee produced evidence of its pre-infringement growth, infringement decrease in growth and subsequent increase in growth post-infringement. *Id.* at 1068. The Federal Circuit held that the post-infringement growth rate was admissible evidence to show that the plaintiff would have grown at the pre-infringement growth rate had the defendant not infringed. *Id.* The court ruled that in a two supplier market "an award based on projected lost sales[16] is neither remote nor speculative when

---

[16] The projected lost profits in *Lam* were for damages which continued to accrue after suit was filed and before the final decision was handed down. 718 F.2d 1056.

there is evidence of actual pre-infringement and post-infringement growth rates." *Id*.

<u>Post-Argument Submissions on Damages Calculation</u>

At the hearing on March 28, 2007, I requested Rosco's counsel to furnish me with authority on the subject of how to calculate damages where one party has changed the design of a product to avoid infringement, yet continues to call the newly designed product by the same name as the original, infringing product.

The cases submitted by Rosco do not address the issue at hand. Rosco's submission begins by quoting *Slimfold Mfg. Co., Inc. v. Kinkead Indus.,* stating that "[i]ntentional 'designing around' the claims of a patent is not by itself a wrong which must be compensated," and that, "... the protected invention is what the claims say it is, and thus that infringement can be avoided by avoiding the language of the claims." 932 F.2d 143, 1457 (Fed. Cir. 1991). However, this quote is taken out of context. This language is addressing whether or not the accused product in the case infringed, it is not addressing whether an injured party can collect damages for a once infringing product that is newly redesigned. In fact, the next sentences of the opinion state,

"[t]hus, the first question which must be asked is 'has

> a substantial change been made [to the infringing
> product]?'  Only if the answer to that question is "no"
> should an accused infringer be liable for improperly
> trying to appropriate the claimed invention."

*Id*. at 1457.  The opinion is addressing infringement, not damages
stemming from the infringement.

Rosco argues that no damages can be awarded with respect to
redesigned products until those products are compared to the
claim language of the patent and found to infringe, and further
that the use of the same name for the redesigned products, the
Hawkeye trademark, has no bearing on damage calculation.  Rosco
cites *Amstar Corp. v. Envirotech Corp.* as the controlling
decision for this proposition.  823 F.2d 1538, 1545 (Fed. Cir.
1987).  This case, too, is not on point.  The purpose of the
post-argument damage submission is not to decide whether the
mirrors in question infringe.  No case law has been submitted by
either side concerning damages calculations, and how damages
should be calculated based on causation for products that no
longer infringe, but, nonetheless have negatively impacted the
market, customer base and sales of the patent owner.  *See, e.g.,*
*Lam, Inc.,* 718 F.2d 1056.  Rosco's cites to *Lund Indus., Inc. v.*
*Go Indus., Inc.*, 938 F.2d 1273 (Fed. Cir. 1991), *Carnegie Mellon*
*Univ. v. Hoffmann-LaRoche, Inc.,* 55 F. Supp. 2d 1024 (N.D. Cal.
1999), *Tenaz Corp. v. Tensar Corp.,* No. 89-424, 1991 U.S. Dist.

LEXIS 19853, 65-69 (D. Md. 1991), and *Dentsply Int'l Inc. v. Soft-Core Sys., Inc.,* No. 97-400, 1999 U.S. Dist. LEXIS 13873 (D. Del. 1999) are similarly not on point as Rosco offered these cases to show, that as in *Amstar*, design-arounds are encouraged and not a basis for infringement.

Rosco cites *Applied Med. Res. Corp. v. United States Surgical Corp.,* 435 F.3d 1356 (Fed. Cir. 2006). In that case, a product was redesigned (after infringement)and the redesigned product was then sold under the same trademark as the infringing product. *Id.* Both the original product and the redesigned product were found to infringe. *Id.* According to Rosco, the continued sales of the redesign under the same trademark had no bearing on damages calculations. However, no such determination was made by the court in *Applied*. *Applied* only addressed damages calculations to the extent that the court reviewed whether the reasonable royalty rate determined by the jury for the first infringement should apply to the infringement of the redesigned product. *Id.* at 1360. The reasonableness of the royalty rate, itself, was not being contested.

Legal Standard for Summary Judgment

Summary judgment is appropriate "[w]hen the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538

(1986). Rule 56 of the Federal Rules of Civil Procedure provides for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Elec. Inspectors, Inc. v. Vill. of E. Hills*, 320 F.3d 110, 117 (2d Cir. 2003). A fact is material when it "might affect the outcome of the suit under the governing law." *Id.*

The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists. *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir. 1987). In order to defeat such a motion, the non-moving party must raise a genuine issue of material fact. Although all facts and inferences therefrom are to be construed in the light most favorable to the non-moving party, the non-moving party must raise more than a "metaphysical doubt" as to the material facts. *See Matsushita*, 475 U.S. at 586; *Harlen Assoc. v. Vill. of Mineola*, 273 F.3d 494, 498 (2d Cir. 2001).

In a patent infringement case, courts use a two step process to determine whether a party is entitled to summary judgment.

The first step is to determine the meaning and scope of the patent claims that are allegedly being infringed.  *Markman v. Westview Instruments, Inc.,* 53 F.3d 967, 976 (Fed. Cir. 1995). "At the second stage of an infringement analysis, the finder of fact must determine whether the accused device contains elements corresponding to the properly construed limitations of the disputed claims."  *Romag Fasteners, Inc. v. Mitzi Intern. Handbags and Accessories, Ltd.,* 323 F.Supp.2d. 512, 522 (S.D.N.Y. 2004.

The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249; *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).  If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable.  *Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 128 (2d Cir. 1996); *Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir. 1991).

The same standard of review applies when, as here, there are cross-motions for summary judgment.  "When cross-motions for summary judgment are filed, the standard is the same as that for individual motions for summary judgment.  The court must consider each motion independently of the other and, when evaluating each,

the court must consider the facts in the light most favorable to the non-moving party." *Palmiotti v. Metro. Life Ins. Co.,* 423 F.Supp.2d 288, 296 (S.D.N.Y. 2006) (internal citations and quotation marks omitted).

## Rosco's Motion for Summary Judgment of No Patent Infringement and Mirror Lite's Motion for Summary Judgment of Infringement

These summary judgment motions stem from my Memorandum Opinion and Order of September 29, 2006, in this case acknowledging Rosco's contention that some of its mirror may have constant radii of curvature. I stated that Mirror Lite could determine whether or not the mirrors have constant radii of curvature for the purposes of damages discovery. (Mem. Op. and Order, Sept. 29, 2006.)

Rosco contends that none of the mirrors in issue here infringe on Mirror Lite's '984 patent. Rosco listed five mirror types at issue here by manufacturer, manufacturing process and name. They are (1) the Lexalite made, injection molded, Mini Hawkeye mirror; (2) the Lexalite made, injection molded, Haweye mirror; (3) the Replex made, vacuum formed, Mini Hawkeye mirror; (4) the Replex made, vacuum formed, Hawkeye mirror; and (5) the Replex made, thermo-molded Hawkeye mirror. These mirrors are all sold under the Hawk Eye and Mini Hawk Eye names[17]. Rosco argues that mirrors (1), (2), and (5) have constant radii of curvature

---

[17] Rosco owns the Hawk Eye and Mini Hawk Eye trademarks.

on their major axes as described in three patents issued to Rosco since 2001 and therefore do not infringe on Mirror Lite's '984 patent. Rosco also argues that mirrors (3) and (4) have a constant radius of curvature over "substantial central sections" (Rosco's Consolidated Mem. Supp. Summ. J. 3) and decrease thereafter to the perimetral edge and thus the radius of curvature of these mirrors does not have varying and decreasing radii of curvature along their major axes and thus do not infringe on Mirro Lite's '984 patent.

Mirror Lite opposes Rosco's Motion for Summary Judgment arguing that mirrors (1), (2), and (5) do not have constant radii of curvature and thus are infringing products. Mirror Lite's argument concerning mirrors (3) and (4) is that Rosco is asking the court to reinterpret the meaning of the claims of the '984 patent, which has already been interpreted. Mirror Lite argues its patent calls for a radius of curvature that decreases along the major axis.

### Mirrors (3) and (4)

There is no disputed fact as to these mirrors. Rosco argues that mirrors (3) and (4) do not fall within the scope of the claims of the '984 patent because they have central sections of constant curvature and sections of varying radii of curvature which begin adjacent the perimetral edges of the mirrors. (Rosco's Consolidated Mem. Supp. Summ. J. 25.) Rosco argues that

the claims of the '984 patent should be interpreted to mean that the radius of curvature of the lens must begin decreasing and must constantly decrease from the intersection of the major and minor axes all along the major axes until the perimetral edge of the lens. Mirror Lite agrees with Rosco that the lenses of mirrors (3) and (4) have varying radii of curvature, but disagrees with Rosco as to whether, if there are portions of the lens with a constant curvature, those portions are significant in interpreting the scope of the '984 patent.

Since there are no issues of fact to resolve pertaining to mirrors (3) and (4), I now turn to the issues of law concerning these mirrors. The question here is whether these two mirror infringe the '984 patent. Rosco argues that claims in the '984 patent should be interpreted as requiring the radius of curvature to begin decreasing at the intersection between the major and minor axes and continue varying and decreasing along the major axes until the perimetral edge. (Rosco's Mem Supp. Claim Construction.) Mirror Lite contends that the claims have already been interpreted as only requiring the radius of curvature to decrease somewhere along the major axis of the lens. In addition, Mirror Lite argues that Rosco should be precluded from supplementing the record or trying to reargue claim interpretation due to law of the case, collateral estoppel and/or res judicata because the patent has already been interpreted by this court and by the Federal Circuit.

"Questions of construction are questions of law for the judge, not questions of fact for the jury." *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996) (quoting A. Walker, Patent Laws § 189, p. 173 (3d ed. 1895)). If a patent cannot be interpreted on its face (i.e. by its claim language), a court looks first to intrinsic evidence including the patent specification and the patent's prosecution history. *Phillips v. AWH Corp.,* 415 F.3d 1303 (Fed.Cir.2005). If the intrinsic evidence does not shed light on the interpretation, a court may look at extrinsic evidence such as expert interpretation, treatises and dictionary definitions. *Id.* at 1317 (citing *C.R. Bard, Inc., v. U.S. Surgical Corp.,* 388 F.3d 858 (Fed.Cir.2004)).

I have already ruled on claim interpretation of claim one in the '984 patent[18], and as such Rosco cannot relitigate the claim interpretation[19]. In my Memorandum Opinion and Order of August 26, 2005, I explicitly addressed the issue of claim one's interpretation[20]. I said that claim one reads:

---

[18] Because the claim language has already been interpreted by this court and the Federal Circuit, I did not consider Rosco's Memorandum on Claim Construction Concerning Varying Radius of Curvature and Mirror Lite's Motion to Strike Rosco's Memorandum on Claim Construction Concerning Varying Radius of Curvature is denied as moot. For the same reason, there is no need to consider any evidence relating to the prior art Lomar mirror offered by Rosco. Therefore, Mirror Lite's Motion to Strike New Evidence and Reliance on a Lomar Mirror is also denied as moot.

[19] Based on the doctrine of the law of the case, discussed below.

[20] I based this interpretation not only on the Court's July 8, 2003 memorandum and order but also on testimony given by Rosco's witnesses at trial.

1. A mirror assembly, comprising:

(a) a mirror lens having a reflective outer[21] surface and a non-reflective rear surface, the mirror lens comprising a mirror body which terminates in an oval perimetral edge, the edge surrounds the reflective surface and the non-reflective surface of the mirror lens, the mirror body being a substantially convex ellipsoid having a major axis and a minor axis which intersects with the major axis, the major axis having a <u>varying radius of curvature, which radius decreases</u> from the intersection with the minor axis.

The Court previously construed this claim in its July 8, 2003, memorandum and order in a fashion parallel to its plain language as follows:

> Claim 1 of the '984 patent describes a mirror assembly whose lens has a reflective surface and a non-reflective rear surface that are surrounded by an oval perimetral edge, is a substantially convex ellipsoid, and has intersecting major and minor axes. The major axis has <u>a radius of curvature that decreases</u> from the intersection with the minor axis to the perimetral edge.

*Rosco, Inc. v. Mirror Lite Co.*, CV-96-5658 (E.D.N.Y. July 8,

---

> Q: Does your mirror body being a substantially convex ellipsoid having a major axis and minor axis which intersects with the major axis, the major axis having a bearing radius of curvature which radius decreases from the intersection with the minor axis to the perimetral edge, does the Rosco cross-view oval shape mirror have that?
>
> A: Yes, our mirror is a substantially convex ellipsoid by definition of being an ellipse, major and minor, the minor does intersect with the major axis and along the major axis <u>there is a various radius of curvature and that radius value does decrease</u> from the intersection of the minor access which is the center of the mirror as it goes towards the perimetral edge.

(Tr. 109-11.)

Similarly, Rosco's expert witness, Harvey Manbeck, testified as follows:

> Now, the final thing is, the mirror axis having a <u>varying radius of curvature, which radius decreases</u> from the intersection with the minor axis to the perimetral edge. Well, that, too, is in here, is shown in the ['357] patent.
>
> So, the ['357] patent meets every limitation of the claim....

(Tr. 175-76.)

[21] In its July 8, 2003 memorandum and order, the Court omitted the word "outer" from its recitation of the claim language.

2003).  The claim means that the radius of curvature decreases

from the intersection to the perimetral edge of the lens.  This

construction was neither affirmed nor reversed on appeal.

Indeed, because that determination was not reversed by the Court

of Appeals, it is the law of the case[22] -- a doctrine "based on

the salutary public policy that litigation should come to an

end."  *White v. Murtha*, 377 F.2d 428, 431 (5th Cir. 1967).  I

recognize that the court that established the law of the case can

review its earlier decision, consistent with the previous

decisions of the Court of Appeals, if one of three "exceptional

circumstances" exists: 1) the evidence on a subsequent trial was

substantially different; 2) controlling authority has intervened;

or 3) the earlier decision was clearly erroneous and would work a

manifest injustice.  *Perkin-Elmer Corp. v.  Computervision Corp.*,

732 F.2d 888, 900 (Fed. Cir. 1984); *see also Messinger v.

Anderson,* 225 U.S. 436, 444 (1912) (Holmes, J.) (stating that the

doctrine expresses a general practice and not a limit on a

court's power).  However, none of these exceptions have been

argued to apply nor do they apply here.

Based on the meaning of claim one of the '984 patent and

Rosco's admission that mirrors (3) and (4) each have areas of

decreasing radius of curvature along its major axis, mirrors (3)

---

[22] Because I have concluded that the claim language has already been
interpreted and stands based on the doctrine of the law of the case, I will
not address Mirror Lite's argument that the Court's previous claim
interpretation should be upheld based on collateral estoppel or res judicata.

and (4) fall within the scope of the '984 patent and infringe.
Therefore, Rosco's Motion for Summary Judge of No Infringement as
to mirrors (3) and (4) is denied and Mirror Lite's Motion of
Summary Judgment of Infringement is granted as to these mirrors.

### Mirrors (1), (2), and (5)

There is a factual dispute as to whether these mirrors do,
in fact, have constant radii of curvature along their major axes.
Rosco argues through various tests and declarations by experts
that each of these mirrors was designed to have, and does have, a
constant radius of curvature using computer software to produce
the mold for the mirrors. (Englander Decl., ¶25-26.)  Mirror Lite
has offered as evidence expert declarations to the contrary, that
their experts also ran tests on the mirrors to ascertain their
radius of curvature and found them to be varying, not constant.
(Swain Decl. I, ¶7-14, Jan 16, 2007; Prof. Howell Decl. ¶9-11,
Jan. 12, 2007.)  Hence, neither Rosco nor Mirror Lite, as the
moving party in their respective summary judgment motions, has
shown that there is no genuine issue of material fact as to
mirrors (1), (2) and (5).  "Where, as here, the parties present
competent evidence supporting their opposing views of a material
fact, summary judgment is improper." *Leventhal v. Franzus Co.,
Inc.,* No. 88-3547, 1988 WL 132868 at *8 (S.D.N.Y. Dec. 6, 1988)
(internal citations omitted).  Therefore, summary judgment must
be denied to both Rosco and Mirror Lite as to whether or not

these mirrors infringe the '984 patent.

As I stated above, however, the question is whether the Hawk Eye and Mini Hawk Eye mirrors currently sold by Rosco are the same product as the mirrors found to infringe at trial. Rosco contends that they are not, as evidenced by their tests results that the mirrors now have constant radii of curvature. Even if the infringing aspect has been removed, Rosco's sales of the Hawk Eye and Mini Hawk Eye mirrors may continue to hurt Mirror Lite's market for its crossview mirrors, and as such, Mirror Lite is entitled to conduct discovery with regard to these mirrors.

## CONCLUSION

For the reasons set forth above, Rosco's Motion for Summary Judgment is denied, and Mirror Lite's Motion for Summary Judgment is granted in part and denied in part. Mirror Lite's Motions to Strike Rosco's Memorandum on Claim Construction and Rosco's New Evidence and Reliance on a Lomar Mirror are denied as moot. Mirror Lite's Motion to Strike the Declaration of Peter Sinclair is denied. Mirror Lite's Motion to Strike Rosco's Newly Offered CMM Tests and Accompanying Supporting Declaration of Professor Folan is denied in part and granted in part. Rosco's Motion to Strike the Declaration of Dr. Howell is granted only with respect to paragraph 10.

The clerk is directed to transmit a copy of the within to all parties and to the Magistrate Judge.

SO ORDERED.

Dated :   Brooklyn, New York

          August 6, 2007

                              By: <u>/s/ Charles P. Sifton (electronically signed)</u>
                                      United States District Judge